**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **RHONDA WOOLARD,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 4:10-CV-3623** |
| | § | |
| **FLUOR ENTERPRISES, INC.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

**MEMORANDUM & ORDER**

Before the Court is Defendant Fluor Enterprises, Inc. ("FEI's") Motion for

Summary Judgment (Doc. No. 36.)  After considering the Motion, all responses and

replies, and the applicable law, the Court concludes that Defendant's Motion should be

**GRANTED**.[1]

**I.      BACKGROUND**

FEI hired Rhonda Woolard on September 3, 2007 to work as a Utility worker on

the construction of the Oak Grove Power Plant, (the "Oak Grove Project") at the entry

wage of $14.95 per hour. (Doc. No. 36-2, ¶ 3 [Carmichael Decl.]). Woolard was hired

with the understanding that she would be laid off when the Oak Grove Project neared

completion. (Rhonda Woolard Dep. 134:2-22, December 20, 2011). Woolard's job duties

included cleaning and ensuring that work areas were free from debris, preparing water

coolers, distributing water coolers around the site, retrieving and replacing water coolers,

and cleaning coolers.  (Woolard Dep. 74:9-12.)

---

[1] Defendant's objections to Plaintiff's summary judgment evidence (Doc. No. 40) are sustained. However, even if the objections were overruled, summary judgment for the Defendant would be appropriate. Finally, Plaintiff's request to file a surreply (Doc. No. 41) is denied.

On September 29, 2007, Woolard was promoted to the position of Tool Room worker and transferred to work in one of the Oak Grove Project's Tool Rooms, resulting in a wage increase to $22.25 per hour. (Doc. No. 36-2, ¶ 4 [Carmichael Decl.]) Her new duties included checking tools in and out of the Tool Room to craft workers, light cleaning of tools, and maintaining and organizing the Tool Room. *Id*. On July 5, 2008, Woolard was promoted to Tool Room Journeyman, resulting in a wage increase to $26.00 per hour. *Id*. Her duties generally remained the same. *Id*.

When Woolard was hired she received a copy of FEI's Craft Employee Handbook, which outlined the procedures by which employees could report problems, suggestions or complaints by using the Open Door Policy or calling FEI's Compliance Hotline. *(*Woolard. Dep. 25:3-86:20; Doc. No. 36-3 [Craft Employee Handbook]; Doc. No. 36-4 [Craft Employee Orientation]; Doc. No. 36-5 [Woolard Acknowledgement of Fluor Policies].) Woolard understood she could raise concerns with a supervisor, the Safety Department, or Human Resources ("HR"), and could contact someone higher up if she was dissatisfied with the result. *Id.* She also understood that she could bypass local management altogether and call the Compliance Hotline. *Id.*

FEI began a series of layoffs at the beginning of 2009, as the Oak Grove Project was close to completion.  (Doc. No. 36-2, ¶ 11 [Carmichael Decl.]) As a part of this process, Woolard was selected to be laid off. When Foreman Martin Solis learned about Woolard's initial selection for the layoff, he approached Woolard about joining his Utility crew in lieu of layoff. Woolard voluntary accepted this position, at the wage of $17.15 per hour, the highest possible rate for that position.  (*Id..* ¶¶ 12, 14.) Woolard claims that on August 21, 2009, she told Solis she wanted to resign due to the fact that

her supervisor, Carolyn Graham, was favoring another female—Shirley Flores—over Woolard. Solis told her to continue working until August 27, 2009, at which point she would be selected for a ROF (reduction of force).  (Woolard Dep. 68:1-6, 68:16-22, 82:1-7.)  On August 27, 2009, HR Manager Tim Parenti informed Woolard that she was not going to be laid off.  Woolard Dep. 69:1-8; Doc. No. 36-8 [Compliance Hotline Report, 8/19/09].) Woolard was not laid off because Graham's crew was staffed with the fewest number of Utility Workers out of the three Utility Worker crews.  (Doc. No. 36-2, ¶ 16 [Carmichael Decl.]) Thereafter, Woolard voluntarily resigned from her position as a Utility Worker at the Oak Grove Project because she no longer liked her job and did not like working with Graham.  Woolard Dep. 69:2-16.  FEI never asked Woolard to resign. (Doc. No. 36-2, ¶ 17 [Carmichael Decl.])

Woolard brings sex discrimination, retaliation, and hostile environment claims against FEI. Woolard bases her claims on inappropriate comments made towards her, an uncomfortable work environment, and the denial of her request to be laid off. More specifically, Woolard claims that she experienced:

### 1. Inappropriate Comments and Behavior of Monty Campbell

Monty Campbell, the Tool Room General Foreman, allegedly: (1) twice told Woolard, "if you just gave me one chance, you'd come back for more . . . they call me Hannibal liquor," (sic) and then wiggled his tongue at her, (Doc. No. 5, ¶ 14 [Complaint "Cmpl."]; (Woolard Dep. 93:8-17); (2) occasionally touched her neck and shoulders, making comments such as "You're quiet, are you ok?  Do you need a massage?"  (Doc. No. 5, ¶ 15 [Cmpl.], Woolard Dep. 93:8-19, 94:20-24); (3) threw rocks into the toilet of the portable restroom so that the blue water would "splash up" on her, (Woolard Dep.

3

95:9-19); (4) told Woolard he was unmarried, (Woolard Dep. 97:21-98:3); (5) sometimes called Woolard "Biggie" or "Biggin" over the radio, (Woolard Dep. 97:6-15, 98:1-3); and (6) would not allow Woolard her allotted thirty minute lunch break and told her, "If any fuckin' body comes to that window, you WILL help them," (Doc. No. 5, ¶ 27 [Cmpl.]). Woolard did not complain to anyone at FEI, or report the incidents to HR or the Compliance Hotline. (Woolard Dep. 94:10-95:8, 95:25-96:17, 97:16-20, 99:13-15, 104:15-17.)

### 2. Inappropriate Comments and Behavior of T.J. Chambers

Woolard alleges that T.J. Chambers, an Iron Worker General Foreman: (1) would "look [her] up and down licking his lips," (Woolard Dep. 100:16-19); (2) once asked her to pull up her skirt so he "could see that camel toe," (Doc. No. 5, ¶ 20 [Cmpl.]); (3) once walked into the Tool Room, acted like he was going to unzip his pants and stated "nobody's looking," (Woolard Dep. 100:16-101:1); (4) once responded "I'll tell you what's not up" after she asked him "what's up?" (Doc. No. 5, ¶ 17 [Cmpl.]); and (5) once after work and away from the workplace grabbed her rear end when they were standing in line at the grocery store. (Woolard Dep. 101:2-7.) Woolard never reported Chambers' alleged harassing behavior to FEI. (Woolard Dep. 102:9-13.)

### 3. Inappropriate Comments and Behavior of Martin Solis

Woolard alleges that Solis: (1) once told her she could "get him wet anytime" after she playfully sprayed him with water, (Woolard Dep. 54:24-55:7); (2) on another occasion, told Woolard "I already told you you can get me wet any time you want," after she jokingly told Solis she was going to spray him with water, (Woolard Dep. 55:20-56:2); (3) once touched her neck in a "seductive way," (Doc. No. 5, ¶ 33 [Cmpl.],

Woolard Dep. 55:12-17); and (4) occasionally touched her hair "in a teasing way,"  (Doc. No. 5, ¶ 33 [Cmpl.], Woolard Dep. 55:16-19). Woolard never reported Solis' alleged harassing behavior to FEI. (Woolard Dep. 56:5-16.)

    4. **Inappropriate Comments and Behavior of Robert Rouse**:

Woolard claimed that after her transfer to Solis' Utility crew, she went to Robert "Doc" Rouse, a Senior Occupational Nurse, for treatment of sunburn.  (Woolard Dep. 58:24-59:7.)  Woolard alleges that Rouse asked her to pull up her shirt so he could apply cream to her shoulders and, when he was finished, remarked, "Isn't that just like a man? We'll help you take your clothes off, but we won't help you put them back on." (Woolard Dep. 59:5-22.) Woolard never reported Rouse's alleged harassing behavior to FEI. (Woolard Dep. 60:4-8.)

On or about October 24, 2008, Belcher and Mandy Wandrick ("Wandrick"), a Utility Worker, reported to HR that Rouse, who treated minor medical conditions at the Oak Grove Project, had allegedly touched some female employees in an inappropriate manner. (Doc. No. 36-2, ¶¶ 6, 7.)  Carmichael, the Senior HR Manager, then launched his investigation by reviewing the first-aid logs to determine if any other female employees had seen Rouse for first-aid treatment. Carmichael then interviewed ten female employees who had seen Rouse.[2] (Doc. No. 36-2, ¶ 11, ¶ 12.) Based on the results of the investigation and a little over two weeks after first receiving the reports about Rouse, FEI took the following actions: (1) Rouse received a written reprimand for any unprofessional behavior that may have occurred; (2) moving forward, Rouse was permitted to treat female employees only if another female employee was present; and

---

[2] Woolard was neither interviewed nor identified as a witness and FEI had no record of any complaints from her. *Id.*

(3) Rouse was required to attend sexual harassment training.  (Doc. No. 36-2, ¶ 10, Doc.

No. 36-10 [Written Reprimand of Robert Rouse].) Thereafter, no new or additional

concerns were raised about Rouse.  *Id.*

### 5. Inappropriate Comments by Other Coworkers

Woolard claims that (a) Alberto Serrano, a Reinforcing Iron Worker/Robuster

Journeyman, called her "donkey lady" and text messaged pictures of women having

sexual relations with donkeys to some of Woolard's coworkers (but not to Woolard

herself), (Woolard Dep. 106:19-107:1); (b) Richie Maynor, an Iron Worker, used the

term "camel toe" to refer to Woolard, (Woolard Dep. 127:23-25); and (c) Jason Bates, a

Tool Room Worker, once told Woolard that she had "nice boobs," (Woolard Dep.

129:20-25.)  Woolard admits that she never complained to anyone at FEI about any of the

alleged harassing behavior by Serrano, Maynor or Bates.  (Woolard Dep. 107:2-4, 128:3-

10, 129:15-18, 130:5-6.)

### 6. Uncomfortable Work Conditions

Like Belcher and Smith, Woolard alleges that the sidewalks and walls of FEI

were filled with sexually explicit graffiti, including pictures of naked women, male

private anatomy, and individuals involved in sexual acts. (Doc. No. 5, ¶ 24; Woolard

Dep. 107:18-24.) Woolard did not report her concerns about the graffiti to FEI. (Woolard

Dep. 108:13-16.)

Woolard also alleges that liquids would fall on the Crew from elevated

levels. (Doc. No. 5, ¶ 24; Woolard Dep. 110:19-24, 112:7-10.) Woolard could not

identify who had spilled the liquid on her or whether it was intentional. (Woolard Dep.

110:19-25, 111:8-11, 113:2-5, 120:10-18.) Woolard also testified that she did not think

that the liquid was actually urine. (*Id.*) Additionally, Woolard never reported these

concerns to HR on the Compliance Hotline. (Woolard Dep. 111:8-113:1, 121:3-5.)

As far as Woolard's claims overlap with her coworker, Dena Belcher, who also

has a lawsuit pending in this Court, the Court has already described FEI's work

environment in its Order on Summary Judgment in Belcher's case. Woolard, Belcher,

and Esmeralda Smith's cases against FEI are all in this Court. The claims are

substantially similar, and the cases were consolidated for purposes of discovery. As

Belcher's case was designated the lead case, with the earliest trial date, the Court has

already published its findings in that Order, and therefore, publishes a shorter order here.

## II.    LEGAL STANDARD

Summary judgment is warranted where a party establishes that there is no genuine

dispute about any material fact and the law entitles the party to judgment. Fed. R. Civ. P.

56(c); *Celotex v. Catrett*, 477 U.S. 317, 322-23 (1986). The party seeking summary

judgment bears the burden of demonstrating that there is no actual dispute as to any

material fact of the case. Fed. R. Civ. P. 56(a), *Willis v. Roche Biomed. Lab.,* 61 F.3d

313, 315 (5th Cir. 1995) (citing *Celotex*, 477 U.S. at 322).

Furthermore, the summary judgment standard "provides that the mere existence of

*some* factual dispute will not defeat a motion for summary judgment; Rule 56 requires

that the fact dispute be *genuine* and *material*." *Willis*, 61 F.3d at 315. First, "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law are

material." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Second,

a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict

for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248). While all justifiable

inferences should be drawn in the nonmovant's favor, conclusory affidavits will not suffice to create or negate a genuine issue of fact. *Anderson,* 477 U.S. at 255; *Reese v. Anderson*, 926 F.2d 494, 498 (5th Cir. 1991); *Shaffer v. Williams,* 794 F.2d 1030, 1033 (5th Circ. 1986).

### III.   ANALYSIS

Before addressing the merits of Defendant's Summary Judgment Motion, the Court will address Plaintiff's Request for Leave to file a Surreply. The Court denies Plaintiff's request. The Federal Rules of Civil Procedure do not expressly provide for the filing of a surreply, thus necessitating parties to file a motion for leave before filing a surreply. *McClyde v. Jackson*, 2010 U.S. Dist. LEXIS 11082, *26 (S.D. Tex. 2010); *Garrison v. Northeast Georgia Medical Center*, Inc., 66 F.Supp.2d 1336 (N.D. Ga. 1999).

Leave to file a surreply is granted only in limited circumstances. *Lacher v. West*, 147 F.Supp.2d 538, 539 (N.D. Tex. 2001); *Ponder Research Group, LLP v. Aquatic Navigation, Inc.*, 4:09-CV-322-Y, 2009 WL 2868456 (N.D. Tex. Sept. 4, 2009); *Weems v. Hodnett*, 10-CV-1452, 2011 WL 2731263 (W.D. La. July 13, 2011). The Court finds that the Defendant did not raise new legal theories or attempt to present new evidence in the Reply that would necessitate a surreply by Plaintiff. Thus, the Court denies Plaintiff's request to file a surreply.

Woolard's claims are governed by the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). Woolard must first establish a prima facie case by establishing: (1) she was in a protected class (female); (2) she was otherwise qualified for the position; (3) she suffered an adverse employment action; and

(4) she was treated less favorably than other similarly situated employees under nearly identical circumstances. *Lee v. Kansas City of Souther Ry. Co.,* 574 F.3d 253, 259 (5th Cir. 2009). If Woolard can establish a prima facie case, the burden of production shifts to FEI to articulate a legitimate, nondiscriminatory reason for its employment decision(s). *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).

If Woolard has articulated a legitimate, nondiscriminatory reason for all of the adverse employment actions it has taken with respect to Woolard, Woolard may prevail only by proving that each of FEI's proffered reasons is pretextual or that FEI was somehow motivated by Woolard's sex in making its decision. *Nasti v. Ciba Specialty Chem. Corp*., 492 F.3d 589, 593 (5th Cir. 2007). Pretext is not established if Woolard creates only a weak issue of fact as to whether FEI's reason is untrue, and there is "abundant and uncontroverted independent evidence that no discrimination . . . occurred." *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 148 (2000).

Sex Discrimination Claim

In order to prove a prima facie case of sex discrimination, Woolard must demonstrate that she suffered an adverse employment decision. For intentional discrimination claims, an actionable adverse employment action must be an "ultimate employment decision" such as "hiring, granting leave, discharging, promoting, and compensating." *McCoy*, 492 F.3d at 559 (5th Cir. 2007). Woolard's claim that she was given "demeaning" cleaning jobs (Doc. No. 5, ¶ 12) does not constitute an ultimate employment action. *See Hart v. Life Care Ctr. Of Plano*, 243 Fed. Appx. 816, 818 (5th Cir. June 26, 2007) (being assigned more difficult tasks is not actionable).

Woolard was selected for layoff because the Oak Grove Project was approaching substantial completion, and this is when she chose to become a Utility Worker in Solis' crew rather than leave her employment at the Oak Grove Project. Woolard must establish she was selected for layoff *because of her sex* (or because she engaged in protected activities), while similarly-situated employees outside her protected class were retained. *E.E.O.C. v. Texas Instruments Inc.*, 100 F.3d 1173, 1181 (5th Cir. 1996). Woolard cannot establish that she was treated less favorably than other Tool Room Journeymen because she cannot show that she was similarly-situated to any of them.  Woolard's admits that she was the only journeymen that remained in her Tool Room (Woolard Dep. 102:17-103:12), and thus, she is unable to show that she was similarly-situated to a male employee in nearly identical circumstances. *See, e.g., Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009) ("[W]e require that an employee who proffers a fellow employee as a comparator demonstrate that the employment actions at issue were taken under nearly identical circumstances.")

Additionally, FEI's denial of her layoff request once she was on Solis' Utility crew is not an adverse employment action. An employer's decision *not* to take an adverse employment action cannot be converted into one simply because the employee requests it.  *See Jones v. Reliant Energy-ARKLA*, 336 F.3d 689, 692 (8th Cir. 2003) (although plaintiff would have preferred termination with severance instead of transfer, court will not interfere with employer's decision not to offer severance, even if it offered other employees a choice; any other holding would lead to the absurd result that Jones suffered an adverse employment action because she was *not* fired.").

10

Finally, Woolard left her position as a Utility worker, stating that she did not like her job or working with Graham. To succeed on a constructive discharge claim, Woolard must provide evidence that FEI made her working conditions "so intolerable that a reasonable person would feel compelled to resign." *McCoy*, 492 F.3d at 557. The test is objective, asking whether a "reasonable employee" in Woolard's circumstances would have felt "compelled to resign," not whether Woolard actually felt compelled to resign. *Barrow v. New Orleans S.S. Ass'n*, 10 F.3d 292, 297 n.19 (5th Cir. 1994). Woolard's resignation on the ground that she no longer liked her job was not objectively reasonable as a matter of law. An objectively reasonable person would not have resigned from a steady paying job merely because she did not like her supervisor. *Brown v. Kinney Shoe Corp.*, 237 F.3d 556, 566-67 (5th Cir. 2001).

Additionally, Woolard admits that FEI launched an investigation into her concerns about Graham soon after it received her August 19, 2009 Hotline Complaint. (Woolard Dep. 76:11-24.) *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 310 (5th Cir. 1987) ("Because [the employer's] prompt response was the antithesis of 'inaction,' [the plaintiff] was not constructively discharged.")  However, Woolard quit before learning the results of the investigation. (Woolard Dep. 143:21-144:7.) *Williams v. Barnhill's Buffet, Inc.,* 290 Fed. Appx. 759, 762 (5th Cir. 2008) (an employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged). Even with Woolard's claims of harassment, Woolard does not present sufficient evidence to support a finding of constructive discharge. Woolard has presented no evidence that any alleged harassment was calculated to encourage her resignation, nor was she offered early retirement or less favorable

employment terms. *See Landgraf v. USI Film Products,* 968 F.2d 427, 430-31 (5th Cir.

1992), *aff'd*, 511 U.S. 244, 114 S.Ct. 1484 (1994) (finding that "substantial harassment"

involving "continuous and repeated verbal comments and physical contact," did not rise

to the level necessary to establish a constructive discharge claim).

Retaliation Claim

      Woolard also argues that her selection for layoff, assignment of demeaning duties

as a Utility worker, and later denial of her layoff request were forms of retaliation. To

establish a *prima facie* case of retaliation, Woolard must establish: (1) she engaged in

protected activity; (2) an adverse employment action occurred; and (3) a causal link

exists between the protected activity and the adverse employment action.  *Septimus v.*

*Univ. of Houston*, 399 F.3d 601, 610 (5th Cir. 2005). Protected activity includes opposing

an employment practice protected under Title VII, making a charge of discrimination, or

testifying, assisting, or participating in an investigation or proceeding under Title VII.

*Mota v. Univ. of Texas Houston Health Science Center*, 261 F.3d 512, 519 (5th Cir.

2001).   If Woolard establishes a *prima facie* case of retaliation, the same burden shifting

analysis described for proving intentional discrimination would apply.

      Woolard was eventually selected for layoff because the Oak Grove Project was a

temporary one. Woolard does not know who made the decision to lay her off from the

Tool Room or why she was selected for layoff.  (Woolard Dep. 120:4-9.) Thus, Woolard

fails to demonstrate the layoff was retaliatory because she cannot produce any evidence

that the individuals involved in the selection of Woolard for the layoff were aware of any

of the allegations Woolard has raised in this lawsuit. To establish a causal link, "the

plaintiff must produce at least some evidence that the decisionmakers had knowledge of

[her] protected activity." *Manning v. Chevron Chem. Co.,* 332 F.3d 874, 883 (5th Cir. 2003). Additionally, Woolard was not laid off, because Solis offered her a position as a Utility worker.

The assignment of cleaning duties is not an adverse employment action for purposes of her retaliation claim because it did not affect Woolard's job title, grade, hours, salary or benefits, nor did she suffer a diminution in prestige or change in standing among her coworkers. *Stewart v. Mississippi Transp. Comm'n*, 586 F.3d 321, 332 (5th Cir. 2009).

In 2009, Woolard moved from a Journeyman in the Tool Room to a Utility Worker on Solis' crew, due to layoffs in the Tool Room. Because she did not like her job or working with Graham, she wished to be laid off. FEI's decision to deny Woolard's requested layoff should not be considered retaliatory. No case has ever held that the decision to keep an individual employed constitutes retaliation. Even assuming that FEI's decision constitutes an adverse employment action, Woolard has no evidence that other similarly-situated employees were treated differently. FEI kept Woolard employed in August 2009 for legitimate, nondiscriminatory reasons—Graham's staff was staffed with the fewest Utility workers of the three crews. (Doc. No. 36-2, ¶ 16)

Hostile Environment Claim

To establish a sexually hostile work environment claim, Woolard must prove she: (1) belongs to a protected group (female); (2) was subject to unwelcome harassment; (3) the harassment complained of was based on her sex; (4) the harassment complained of affected a term, condition or privilege of employment; and (5) FEI knew or should have known of the harassment in question but failed to take prompt remedial action.

13

*Hernandez v. Yellow Transp. Inc.*, 670 F.3d 644, 651 (5th Cir. 2012), *cert. denied* 116 FEP Cases 224 (U.S. Oct. 1, 2012). In determining whether a work environment is objectively hostile or abusive and thus actionable under Title VII, courts look to the totality of the circumstances and examine:  (1) the frequency of the conduct in question; (2) its severity; (3) whether it was physically threatening or humiliating as opposed to a mere offensive utterance; and (4) whether the complained-of-conduct unreasonably interfered with Woolard's work performance.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22-23 (1993).

The Court refers to its Order in *Belcher vs. Fluor Enterprises, Inc.,* No. 4:10-cv-3475 where this Court details why Belcher's complaints regarding the graffiti, demeaning tasks, falling liquids, and Rouse's inappropriate conduct—even aggregated—are not sufficient to prove a hostile environment claim. The Fifth Circuit's "hostile work environment standard is a 'demanding' one, and requires proof of severe or pervasive conduct that can be categorized as 'extreme.'" *Duplechin v. Potter*, 2012 WL 845160 at *5 (S.D. Tex. Mar. 12, 2012) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)).

However, Woolard alleges a number of harassment instances beyond those alleged by Belcher. Woolard received a variety of comments and harassing behavior by Campbell, Chambers, Solis, Serrano, Maynor and Bates. Yet, in all these instances, Woolard did not report the conduct to any one at FEI. Because she failed to take advantage of corrective opportunities, her claim is barred as a matter of law. *Hockman v. Westward Communications, LLC,* 407 F.3d 317, 330 (5th Cir. 2004).

14

Woolard also reports that she faced unfair treatment because her supervisor, Carolyn Graham favored another female, Shirley Flores, over Woolard. None of Graham's alleged conduct is severe or pervasive, especially given Woolard's admissions that she did not mind picking up trash or cleaning offices, and that Flores and Graham (both females) participated in cleaning and trash pick-up. (Woolard Dep. 72:3-6, 73:5-9, 74:22-75:4.)  Nor is there evidence that Graham assigned these tasks to Woolard *because of* her sex;[3] to the contrary, cleaning duties were performed by both genders.  (Woolard Dep. 71:28-25.)

The Court observes that the Fifth Circuit has rejected hostile work environment claims on facts far more egregious than those alleged here.[4] Additionally, whenever Woolard raised concerns using the complaint procedures, it appears that FEI addressed them. As soon as Woolard notified Campbell, her supervisor, about the fish tape incident, he promptly retrieved and disposed of the fish tape and issued a new set of fish tape. Woolard concedes that Campbell's measures prevented this situation from ever occurring again. (Woolard Dep. 122:16-23, 123:11-22.) When Woolard raised concerns regarding

---

[3] See, e.g., *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471 (11th Cir. 1991*)* (plaintiff faces "a difficult burden" where all decisionmakers are within the same protected class); *Richter v. Hook-SupeRx, Inc.*, 142 F.3d 1024, 1032 (7th Cir. 1998) (although not dispositive, evidence that the decisionmakers were members of the same protected class as the plaintiff is significant).

[4] *See e.g., Barnett v. Boeing Co.*, 306 Fed. Appx. 875, 879 (5th Cir. Jan. 15, 2009) (summary judgment on hostile work environment affirmed, despite evidence that a male coworker leered at her, touched her in sexually inappropriate and unwelcome ways, and actively intimidated her after she complained of his actions); *Hockman v. Westward Communications, LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (male coworker's actions of making one remark to the plaintiff about another employee's body, slapping the plaintiff on her behind with a newspaper, grabbing or brushing against the plaintiff's breast and behind, attempting to kiss the plaintiff on one occasion, and standing in the door of the women's bathroom while the plaintiff was washing her hands were isolated, non-serious events that did not qualify as a hostile work environment); *Shepherd v. Comptroller of Pub. Accounts,*168 F.3d 871, 874 (5th Cir. 1999) (male coworker's conduct was not severe or pervasive where he once remarked that plaintiff's elbows were the same color as her nipples, once told her she had big thighs while pretending to look up her dress, stood over her desk on several occasions and attempted to look down her clothing, touched her arm and rubbed her shoulder on several occasions, and on two occasions patted his lap and said "here's your seat" after she arrived late for office meetings).

Graham to the Compliance Hotline, FEI launched an investigation. (Woolard Dep. 76:11-24) Though she was aware there was an ongoing investigation, Woolard resigned just eight days after submitting her complaint, without finding out the results of the investigation. (Woolard Dep.  69:2-16.) Thus, on the evidence presented, Defendant is entitled to summary judgment on Plaintiff's hostile environment claim.

## IV. CONCLUSION

For the reasons explained above, Defendant's Motion for Summary Judgment (Doc. No. 40) is **GRANTED.** The case is **DISMISSED WITH PREJUDICE**.[5]

**IT IS SO ORDERED.**

**SIGNED** at Houston, Texas on this the 15th day of February, 2013.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

---

[5] The Court does wish to note that it is extremely uncomfortable that the state of the applicable law compels dismissal. The allegations of misconduct are serious and, in some instances, odious. However, this Court's sworn duty is to apply existing law, not to offer its own version of what the law should be.